No. 281 May 1, 2024 361

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

THE CONFEDERATED TRIBES OF THE
WARM SPRINGS RESERVATION OF OREGON,
Central Oregon Landwatch,
Annunziata Gould, and Thomas Bishop,
*Petitioners*
*Cross-Respondents,*

*v.*

DESCHUTES COUNTY,
*Respondent,*
*and*

CENTRAL LAND AND CATTLE COMPANY, LLC;
Pinnacle Utilities, LLC; and Kameron Delashmutt,
*Respondents*
*Cross-Petitioners.*

Land Use Board of Appeals No. 2023038

Annunziata GOULD,
The Confederated Tribes of the Warm Springs Reservation
of Oregon, Paul J. Lipscomb, Thomas Bishop,
and Central Oregon Landwatch,
*Petitioners*
*Cross-Respondents,*

*v.*

DESCHUTES COUNTY,
*Respondent,*
*and*

CENTRAL LAND AND CATTLE COMPANY, LLC;
Pinnacle Utilities, LLC; and Kameron Delashmutt,
*Respondents*
*Cross-Petitioners.*

Land Use Board of Appeals No. 2023039

CENTRAL OREGON LAND WATCH,
The Confederated Tribes of the Warm Springs Reservation
of Oregon, Annunziata Gould, and Thomas Bishop,
*Petitioners*
*Cross-Respondents,*

*v.*

DESCHUTES COUNTY,
*Respondent,*
*and*

CENTRAL LAND AND CATTLE COMPANY, LLC;
Pinnacle Utilities, LLC; and Kameron Delashmutt,
*Respondents*
*Cross-Petitioners.*

Land Use Board of Appeals No. 2023041;
A183421(Control), A183430, A183431, A183432, A183436,
A183461, A183462

Argued and submitted March 28, 2024.

Josh Newton argued the cause for petitioner-cross-respondent The Confederated Tribes of the Warm Springs Reservation of Oregon. Also on the briefs were Ellen Grover and Best Best & Krieger LLP.

Carol Macbeth argued the cause and filed the brief for petitioner-cross-respondent Central Oregon Landwatch.

Jennifer M. Bragar argued the cause for petitioner-cross-respondents Annunziata Gould, Thomas Bishop, and Paul J. Lipscomb. Also on the opening briefs were Jay M. Harris and Tomasi Bragar Dubay. Also on the joint cross-answering brief were Jay M. Harris, Tomasi Bragar Dubay, and Carol Macbeth.

Ken Katzaroff argued the cause for respondent-cross-petitioners Central Land and Cattle Company, LLC, Pinnacle Utilities, LLC, and Kameron DeLashmutt. Also on the brief were Keenan Ordon-Bakalian, Megan Breen, and Schwabe, Williamson & Wyatt, P.C.

No appearance for respondent Deschutes County.

Jeffrey B. Litwak filed the brief *amicus curiae* for Columbia River Gorge Commission.

Marcus M. Shirzad, Garrett Brown, and David J. Cummings filed the brief *amicus curiae* for The Confederated Tribes and Bands of the Yakama Nation, The Confederated

Tribes of the Umatilla Indian Reservation, and the Nez Perce Tribe.

Before Tookey, Presiding Judge, Egan, Judge, and DeVore, Senior Judge.

TOOKEY, P. J.

Reversed and remanded to LUBA on petition of The Confederated Tribes of the Warm Springs Reservation of Oregon, for consideration of Tribe's first assignment of error to LUBA; affirmed on cross-petition; otherwise affirmed.

**TOOKEY, P. J.**

This is a judicial review of an order of the Land Use Board of Appeals, dated January 12, 2024, upholding in part and remanding in part an order of the Deschutes County Board of Commissioners (the board) approving an application by Central Land and Cattle Company, LLC, Pinnacle Utilities, LLC, and Kameron DeLashmutt (collectively, Thornburgh) for an amendment to the Final Master Plan (FMP) for the Thornburgh Destination Resort relating to mitigation measures for the development's impacts on fish, which Thornburgh submitted to meet Deschutes County's "no net loss" standard set forth in Deschutes County Code (DCC) 18.113.070(D). Thornburgh seeks to change the FMP by replacing the Fish and Wildlife Management Plan (FWMP) approved in 2008 (the 2008 FWMP) with a new plan (the 2022 FWMP), so as to reduce the resort's proposed annual water consumption by eliminating one of the resort's proposed golf courses.

The five petitioners, The Confederated Tribes of the Warm Springs Reservation of Oregon (the Tribe), Central Oregon LandWatch (LandWatch), Annunziata Gould, Thomas Bishop, and Paul J. Lipscomb (collectively, petitioners) contend that LUBA erred in rejecting their challenges to the approval and raise different and sometimes overlapping assignments of error. The Tribe also contends, among other arguments, that LUBA erred in concluding that its challenges to the BOCC's failure to give sufficient weight to the Treaty of 1855 were unpreserved.[1]

Thornburgh has filed a cross-petition, challenging LUBA's remand, contending that LUBA substituted its judgment for that of the BOCC and weighed the evidence in the record as the factfinder in the first instance, rather than reviewing for substantial evidence, to find that the 2022 FWMP's compliance provisions fail to meet the "no net loss" standard.

We review LUBA's order to determine whether it is "unlawful in substance or procedure." ORS 197.850(9)(a). "A

---

[1] *Amici curiae*—the Confederated Tribes and Bands of the Yakama Nation, the Confederated Tribes of the Umatilla Indian Reservation, and the Nez Perce Tribe, and, separately, the Columbia River Gorge Commission—filed briefs in support of the Tribe's petition.

LUBA order is unlawful in substance if it represents a mistaken interpretation of the applicable law." *Kine v. Deschutes County*, 313 Or App 370, 372, 496 P3d 1136, *rev den*, 369 Or 69, 499 P3d 1279 (2021).

On the Tribe's petition, we conclude that LUBA erred in determining that the Tribe did not preserve its arguments relating to the applicability of the Treaty of 1855 in determining whether the "no net loss" standard has been met, and we therefore remand the order to LUBA for consideration of that argument. We affirm LUBA's order in all other respects on the petitions and cross-petition.

## I.   BACKGROUND

This case is the latest in a long string of challenges to the development of the resort. We described the background facts of the resort in our recent opinion in *Gould v. Deschutes County*, 322 Or App 11, 518 P3d 978 (2022), and we set them out here again only as necessary to resolve the issues raised on judicial review.

Deschutes County provides for the development of destination resorts by a three-step approval process described in Deschutes County Code (DCC) 18.113.040. At step one, a Conceptual Master Plan (CMP) for the resort is processed for approval as though it were a conditional use permit. DCC 18.113.040(A). At the second step, application is made for a Final Master Plan (FMP). DCC 18.113.040(B). The final step is a land division or site-plan review. DCC 18.113.040(C).[2]

In 2008, the county approved an FMP for the resort, and we upheld that approval on judicial review. *Gould v. Deschutes County*, 59 Or LUBA 435 (2009), *aff'd*, 233 Or App 623, 227 P3d 758 (2010) (affirming the FMP). The FMP

---

[2] Thornburgh has completed the three-step approval process for: (1) a golf course site plan; (2) a tentative plan for Phase A-l of development; and (3) a site plan for 80 overnight lodging units (OLUs). Those approvals were challenged and ultimately affirmed on judicial review. *See Gould v. Deschutes County*, 314 Or App 636, 314 P3d 357 (2021), *rev den*, 369 Or 211 (2022) (affirming the approval of a golf course site plan); *Gould v. Deschutes County*, 322 Or App 11, 518 P3d 978, *rev den*, 370 Or 694 (2022) (affirming the approval of the site-plan review for 80 OLUs); *Gould v. Deschutes County*, 322 Or App 571 (2022) (nonprecedential memorandum opinion affirming the approval of the tentative plan for Phase A-l).

provides for phased development. Both the CMP and the FMP included Condition 1, which provides:

> "Approval is based upon the plan as submitted. Any substantial change to the approved plan will require a new application."

The board has determined that "substantial changes" has the meaning as the term is defined in DCC 18.113.080, "an alteration in the type, scale, location, phasing or other characteristic of the proposed development such that findings of fact on which the original approval was based would be materially affected."[3]

The CMP for the resort approved three golf courses and required at least one golf course to be constructed in the first phase. The approval was supported by an economic benefits analysis (Benefit Study) explaining that golf course facilities would be an important source of new jobs with a total of 125 newly created jobs and 3.9 million dollars in employee compensation. Based on the Benefit Study, the county found that the resort "will generate a large number of full-time positions that will have a positive effect on the Deschutes County economy."

The sole source of water for the resort is groundwater to be pumped from the Deschutes River Basin aquifer.[4] There has been significant litigation around the adequacy of the resort's ability to provide the necessary groundwater as well as to satisfy the "no net loss" standard of DCC 18.113.070(D), which is a county criterion for destination resort development that requires that "[a]ny negative impact on fish and wildlife resources will be completely mitigated so that there is no net loss or net degradation of the resource," but those disputes have thus far been resolved favorably to Thornburgh.

---

[3] DCC 18.113.080 relates to modifications of a CMP and provides:

"Procedure for Modification of a Conceptual Master Plan. Any substantial change, as determined by the Planning Director, proposed to an 322An insubstantial change may be approved by the Planning Director. Substantial change to an approved CMP, as used in DCC 18.113.080, means an alteration in the type, scale, location, phasing or other characteristic of the proposed development such that findings of fact on which the original approval was based would be materially affected."

[4] No surface water runs through the resort property.

The FMP for the resort includes a fish and wildlife habitat mitigation plan (FWMP) to satisfy the "no net loss" standard. In 2008, Deschutes County approved the 2008 FWMP for the resort, and we ultimately upheld that determination. *See Gould v. Deschutes County*, 233 Or App 623, 636-43, 227 P3d 758 (2010) (describing 2008 FWMP litigation).

The litigation involved in these petitions and the cross-petition concerns Thornburgh's request to modify the originally approved FMP and 2008 FWMP so as to *reduce* its groundwater consumption through reduced pumping of groundwater from the aquifer, for the stated purpose of complying with the "no net loss" standard. Thornburgh proposed to reduce the resort's annual groundwater pumping from 2,129 to 1,460 acre feet, an approximate 30 percent reduction, and an approximately 35 percent reduction in water consumption, from 1,356 to 882 acre feet, in part, by not developing one of the approved golf courses.[5] The application proposed that, as a modification of the 2008 FWMP and in order to satisfy the "no net loss" standard, Thornburgh would acquire water rights to provide fish habitat benefits or would cancel other water rights.

After a public hearing, a Deschutes County hearings officer rejected the application, based primarily on Thornburgh's failure to provide a sufficient plan for compliance with the "no net loss" standard. On Thornburgh's and Gould's appeal, the board held a *de novo* public hearing. The Tribe, which had not previously been given notice of or participated in the proceedings, requested to be added as a party and participated. The board's order summarized the evidence that had been submitted and found:

> "According to the science and technical reports, there is generally no scientific or biological significance in the impacts under the 2022 FWMP and, as a whole, the plan provides benefits to habitat for fish and aquatic species. Given this context, we find that the 2022 FWMP plan meets the No Net Loss Standard."

Over objections by petitioners and the Oregon Department of Fish and Wildlife (ODFW), the board approved Thornburgh's

---

[5] LUBA's order explains that "consumptive use" means the amount of ground water appropriation that will not return to surface water flows.

request for modification, rejecting contentions that the "no net loss" standard required ODFW and the Tribe's concurrence and concluding that Thornburgh's experts had provided credible, substantial evidence that the 2022 FWMP satisfies the "no net loss" standard:

> "The 2022 FWMP and its extensive technical evidence shows that stream flows will increase and temperatures decrease as a result of implementation of the 2022 FWMP. As such, we find that methods provided by the groundwater mitigation program, including the methods relied upon by the 2022 FWMP, are sufficient to meet the no net loss standard."

The board approved the 2022 FWMP as a modification of the 2008 FMP.

LUBA upheld the board's approval as against all of the petitioners' challenges in most respects but remanded the board's order for reconsideration of those issues that LUBA concluded required further analysis, one of which we address on the cross-petition. We consider the various petitions in the order that we conclude makes logical sense.

## II.   LIPSCOMB'S PETITION, CHALLENGING LUBA'S DEFERENCE TO THE BOARD'S CONSTRUCTION OF "SUBSTANTIAL CHANGE" AS USED IN CONDITION 1

Lipscomb raises two assignments of error on judicial review relating to the BOCC's construction of the text of Condition 1 of the CMP and FMP, which provides that "[a]ny substantial change to the approved plan will require a new application." Lipscomb asserts in his first assignment that the board's construction of "substantial change," as used in Condition 1 is not entitled to deference, because Condition 1 is not an ordinance for which the board's construction is entitled to deference. *Siporen v. City of Medford*, 349 Or 247, 259, 243 P3d 776 (2010) (setting forth standard of deference to local government's plausible construction of its own zoning ordinances). However, as we understand LUBA's order, LUBA concluded that the board's construction was of the ordinance itself and not Condition 1. As LUBA concluded, the board's conclusion that the definition of "substantial change" in DCC 18.113.080 applies to Condition 1 is a

plausible construction to which deference is owed. LUBA did not err.

Lipscomb's second assignment focuses on Condition 1's requirement that "[a]ny substantial change to the approved plan *will require a new application*." (Emphasis added.) Lipscomb argues in his second assignment that the requirement for a "new application" means that, upon a substantial change, the application process must begin anew, with a new CMP. Thus, Lipscomb contends that LUBA erred in affirming the board's determination that it was sufficient for Thornburgh to file an application to modify only the aspect of the approval that is proposed to be changed. LUBA concluded that that construction of the DCC was a plausible one entitled to deference. We have reviewed the relevant provision of the DCC and agree with LUBA that the board's construction of the DCC is a plausible one to which deference is owed. And assuming that the proposed changes are "substantial," within the meaning of DCC 18.113.080,[6] LUBA correctly held that the board could plausibly construe the DCC to not require that the proposed changes start the application process from scratch but, rather, be addressed through an application for modification of the FMP. That concludes our discussion of Lipscomb's petition, with the exception of Lipscomb's concurrence with an argument made by Gould, which we discuss later.

### III.   LANDWATCH'S PETITION, CHALLENGING LUBA'S DEFERENCE TO THE BOARD'S CONSTRUCTION OF "SUBSTANTIAL CHANGE" AS LIMITED TO CONSIDERATION OF PROPOSED MODIFICATION

In approving the 2022 FWMP, the board found that the CMP and FMP approvals did not depend on or require the planned resort to use all of the water predicted as

---

[6] DCC 18.113.080 provides:

"Procedure for Modification of a Conceptual Master Plan. Any substantial change, as determined by the Planning Director, proposed to an approved CMP shall be reviewed in the same manner as the original CMP. An insubstantial change may be approved by the Planning Director. Substantial change to an approved CMP, as used in DCC 18.113.080, means an alteration in the type, scale, location, phasing or other characteristic of the proposed development such that findings of fact on which the original approval was based would be materially affected."

consumptive use in the FMP. Thus, the board found that Thornburgh's commitment in the 2022 FWMP to use less water than contemplated in the FMP and to forego developing a golf course that had been approved in the FMP did not change the approved resort in a manner that would materially affect the CMP/FMP findings as to the satisfaction of a county code requirement that adequate water be available for all proposed uses.[7] LUBA agreed.

LandWatch raises three assignments of error. LandWatch's first assignment, like Lipscomb's, relates to "substantial change." LandWatch asserts that LUBA erred in deferring to the board's conclusion that the determination whether there has been a "substantial change" is limited to consideration whether the *proposed modification* gives rise to a "substantial change." In LandWatch's view, a "substantial change" is any change that materially affects the findings of fact on the which the CMP or FMP approvals rely. LandWatch asserts that the evidence shows that Thornburgh has no water available to supply the resort, primarily through the expiration of Water Right Permit G-17036, and that that is a substantial change that should have been addressed by the board. LandWatch contends that LUBA's order is unlawful in substance in not deciding whether Thornburgh's loss of the available water to supply to the resort constitutes a Condition 1 substantial change, and, like Lipscomb, asserts that LUBA erred in failing to reverse the board's order and require that Thornburgh begin the application process anew.

LUBA reasoned that the question of the availability of water to the resort was not a required aspect of the board's consideration in determining whether the changes proposed by Thornburgh to the FMP and the FWMP met

---

[7] DCC 18.113.070(K) is a resort approval criterion that requires the county to find:

"Adequate water will be available for all proposed uses at the destination resort, based upon the water study and a proposed water conservation plan. Water use will not reduce the availability of water in the water impact areas identified in the water study considering existing uses and potential development previously approved in the affected area. Water sources shall not include any perched water table. Water shall only be taken from the regional 19 aquifer. Where a perched water table is pierced to access the regional aquifer, the well must be sealed off from the perched water table."

the "no net loss" standard. Under the board's interpretation of the "substantial change" inquiry, to which LUBA properly deferred, that conclusion was correct.[8] The board identified its task as determining whether *the changes proposed by Thornburgh* were substantial, not whether circumstances outside of the application had substantially changed. And as Thornburgh correctly responds, the record does not establish that Thornburgh has no water rights available to it. *See Gould v. Deschutes County*, 322 Or App at 18 (affirming LUBA's determination that Thornburgh had met the documentation requirement of FMP Condition 10 pertaining to water rights and mitigation).

LandWatch further argues that LUBA erred in failing to decide that issue, in violation of ORS 197.835(11)(a):

> "Whenever the findings, order and record are sufficient to allow review, and to the extent possible consistent with the time requirements of ORS 197.830(14), the board shall decide all issues presented to it when reversing or remanding a land use decision described in subsections (2) to (9) of this section or limited land use decision described in ORS 197.828 and 197.195."

In fact, LUBA did consider LandWatch's argument and explicitly rejected it, based on its deference to the county's decision to interpret "substantial change" to have the meaning that it does in DCC 18.113.080.

LandWatch, like Lipscomb, contends that LUBA erred in deferring to the county's interpretation of Condition 1 as to the meaning of "substantial change," because no deference is owed to the interpretation of a condition, as opposed to a code provision. LandWatch further argues that, textually, "substantial change" should not mean the same thing in Condition 1 as it does in DCC 18.113.080:

---

[8] LUBA said: "The county has interpreted 'substantial change' in Condition 1 to have the same meaning as the term is used in DCC 18.113.080, which is 'an alteration in the type, scale, location, phasing or other characteristic of the proposed development such that findings of fact on which the original approval was based would be materially affected.' Thus, Thornburgh must submit a new application for any proposed modification that will alter a characteristic of the approved resort development such that any finding of fact supporting the CMP or FMP approval would be materially affected."

"The definition of 'substantial change' in DCC 18.113.080 is limited to that section. It is not a global definition of the term 'substantial change.' DCC 18.113.080 does not define a 'substantial change' as a 'modification.' Rather, DCC 18.113.080 defines a 'substantial change' as an 'alteration.' In DCC 18.113.080, some CMP modifications are substantial changes, and some substantial changes are CMP modifications, but it does not follow that all substantial changes must be CMP modifications."

In LandWatch's view, DCC 18.113.080 does not mandate that all "substantial changes" be defined as in that section of the DCC. LandWatch therefore contends that LUBA should have interpreted "substantial change" as a matter of law. The county's construction is plausible. LUBA therefore did not err in deferring to the county's conclusion that the meaning of "substantial change" as defined in DCC 18.113.080 should apply to Condition 1.

In its second assignment, LandWatch makes the same argument as Lipscomb relating to the board's conclusion that Thornburgh was not required to begin the application process anew but could seek approval for the proposed changes through a modification application. We reject LandWatch's assignment for the same reason we reject Lipscomb's.

In its third assignment of error, LandWatch contends that LUBA erred in affirming the board's determination that CMP Condition 28 has been superseded by Condition 37. Condition 28 provided:

"Applicant shall abide at all times with the [Memorandum of Understanding] with BLM, dated September 28, 2005, regarding mitigation of impacts on surrounding federal lands, to include wildlife mitigation and long range trail planning and construction of a public trail system. *The mitigation plan adopted by Applicant in consultation with Tetra Tech, ODFW and the BLM* shall be adopted and implemented throughout the life of the resort."

(Emphasis added.) After litigation determining that Condition 28 was legally insufficient because it failed to provide an opportunity for public participation in the board's decision on whether Thornburgh's mitigation plan satisfied

the "no net loss" standard, *Gould v. Deschutes County* (*Gould II*), 216 Or App 150, 159, 171 P3d 1017 (2007), the BOCC adopted Condition 37:

> "Applicant shall demonstrate compliance with DCC 18.113.070(D) by submitting a wildlife mitigation plan to the County as part of its application for Final master plan approval. The County shall consider the wildlife mitigation plan at a public hearing with the same participatory rights as those allowed in the CMP approval hearing."

LandWatch asserts that under Condition 28, the ODFW must approve Thornburgh's mitigation plan. LandWatch further asserts that, contrary to LUBA's holding, Condition 37 does not supersede Condition 28. Thus, LandWatch asserts, LUBA erred in affirming the board's approval of the 2022 FWMP, which was not approved by the ODFW.

LandWatch's contention is answered by the fact that, as a textual matter, Condition 28 does not require ODFW's approval of a mitigation plan; it requires that the plan be developed *in consultation* with ODFW. There is no dispute that the 2022 FWMP was developed in consultation with the ODFW. LUBA did not err in concluding that the board's approval of the 2022 FWMP did not require the approval of ODFW.

## IV.   GOUD'S PETITION, CHALLENGING LUBA'S REJECTION OF CONTENTION THAT UNDERLYING CMP IS VOID

In her first assignment of error, in which Lipscomb joins, Gould contends that the board lacked authority to consider Thornburgh's request for a modification of the FMP, because the underlying CMP had become void and no new CMP has been initiated. In rejecting that argument, LUBA deferred to the board's conclusion that the CMP had been incorporated into and superseded by the FMP. We agree with LUBA that the board's conclusion represents a plausible construction of the DCC and that deference was therefore appropriate.

Additionally, as LUBA held, Gould's contention has been rejected by LUBA in *Central Land and Cattle, LLC v. Deschutes County*, 74 Or LUBA 326, *aff'd without opinion*,

283 Or App 286, 388 P3d 739 (2016), *rev den*, 361 Or 311 (2017). Gould challenges LUBA's determination that Gould is attempting to litigate an issue that has previously been determined in *Central Land and Cattle, LLC*, contending that LUBA incorrectly relied on the law of the case, which it argues applies only to appellate decisions. We need not resolve whether LUBA properly referred to law of the case, because, as we said in *Gould v. Deschutes County*, 322 Or App at 23, a party is not entitled to relitigate issues that have been resolved on review of previous phases of the same land use litigation. *Beck v. Tillamook*, 313 Or 148, 153, 831 P2d 678 (1992). LUBA's prior holding is conclusive of the issue.[9]

In her second assignment of error, Gould argues, similarly to LandWatch, that water availability conditions have changed significantly since the original CMP was approved and that a new CMP therefore must be initiated pursuant to DCC 18.113.070(K). For the same reason that we reject LandWatch's first assignment of error, we reject this assignment.

---

[9] LUBA held:

"For purposes of this appeal we will assume without deciding that the CMP approval has become 'void' under DCC 22.36.010(B)(1). However, even if we assume the County's CMP approval became void on November 18, 2011, we conclude below in addressing the third cross-assignment of error that the FMP remand proceedings were initiated by Thornburgh Resort on August 15, 2011, which was before the CMP became void. The county's first FMP approval decision found, with only two exceptions, that the FMP fully complies with the CMP. Those two exceptions have to do with the no net loss/degradation standard that normally applies at the time of CMP approval. The county's decision to defer its finding on the DCC 18.113.070(D) no net loss/degradation standard until FMP approval was affirmed in *Gould v. Deschutes County*, 57 Or LUBA 403 (2008), *aff'd*, 227 Or App 601, 206 P3d 1106 (2009). As Gould correctly notes, the CMP potentially remains a relevant source of FMP approval considerations because at least some of the CMP conditions of approval effectively cannot be performed until after FMP approval. But those conditions of approval were carried forward in the county's first FMP approval decision and remain part of the current FMP approval decision. All requirements of the CMP approval are now requirements of the county's FMP approval. The FMP approval has effectively incorporated and displaced the CMP approval. In these unusual circumstances, where the only remaining questions on appeal concern two issues that were expressly deferred to the FMP decision, we conclude it was not error for the county to proceed to determine on remand whether the errors identified by LUBA in the FMP could be corrected and the FMP approved for a second time, even though the CMP approval has become void."

74 Or LUBA at 346 (footnote omitted).

## V.   BISHOP'S PETITION, CHALLENGING SUFFI-CIENCY OF EVIDENCE OF THE BOARD'S BASELINE DETERMINATION AND LUBA'S DEFERENCE TO THE BOARD'S CONSTRUCTION OF DCC 18.113.070(D)

DCC 18.113.070(D) requires that a destination resort mitigate all negative impacts such that there is no net loss or degradation of fish and wildlife resources, and provides:

"In order to approve a destination resort, the Planning Director or Hearings Body shall find from substantial evidence in the record that:

"\* \* \* \* \*

"D. Any negative impact on fish and wildlife resources will be completely mitigated so that there is no net loss or net degradation of the resource."

On judicial review of the 2008 FMP approval, we interpreted the meaning of "fish and wildlife resources" in DCC 18.113.070(D) to "refer[] not to species of fish and wildlife, but to the habitat that supports fish and wildlife." *Gould v. Deschutes County*, 233 Or App 623, 631-633, 227 P3d 758 (2010). In that opinion, we accepted the parties' understanding that DCC 18.113.070(D) requires, first, an assessment of fish and wildlife resources before development and, second, mitigation to make up for negative impacts caused by development. *Id*. at 631. We determined that "fish and wildlife resources" could be measured by the habitat that supports fish and wildlife, and a plan could satisfy the standard if it "will completely mitigate any impact on the habitat that supports fish and wildlife, without showing that each individual species will be maintained or replaced on a one-to-one basis." *Id*. at 631-634. Thus, the first part of the "no net loss" analysis requires an "assessment of fish and wildlife resources before development." *Id*. at 631. The parties and LUBA refer to the status of fish and wildlife resources before development as the "baseline." Once a baseline condition is established, and once the negative impacts are quantified, the applicant is tasked with presenting a plan that will ensure that the impacts are completely mitigated for the life of the resort. The negative impacts are measured from the

baseline conditions, for example the baseline temperatures and flow rates.

Thornburgh presented, and the board relied on, evidence of streamflow data from the 2016 hydrological year, as a typical hydrological year, for determining baseline flows for purposes of measuring fish habitat impacts. The board further determined the "no net loss" standard only requires a resort to mitigate its own impacts, not the cumulative impacts of drought or other basin-wide water policy and management issues.[10] Bishop argued to LUBA that habitat modeling should account for impacts to the stream system habitat that are "identifiable, predictable, measurable, and reasonably likely to occur," such as drought and changed stream flows in response to implementation of the Deschutes Basin Habitat Conservation Plan (DB HCP), a basin-wide plan that requires eight irrigation districts and the City of Prineville to manage irrigation activities in the Deschutes River Basin to provide habitat protections for endangered fish and wildlife. LUBA reasoned that Bishop's construction is one plausible reading of DCC 18.113.070(D).

---

[10] The board found:

"Many of the arguments and issues related to Thornburgh's 2022 FWMP are related to drought and regional well decline. Opponents assert that these are relevant issues and should lead to denial. We disagree. The No Net Loss Standard requires a resort to mitigate its own impacts, not the cumulative impacts of drought or other basin wide water policy and management issues. The No Net Loss/degradation test is limited to addressing potential negative impacts of resort development. Impacts to habitat caused by other persons or environmental conditions are not attributable to [the resort's] use of water or the impacts of [resort's] use.

"Thornburgh has quantified its impacts on water quality and quantity and the locations where these impacts will occur. It has studied waterway conditions in a typical year, and it has also provided expert evidence that shows the benefits of mitigation are enhanced during periods of drought. This approach properly accounts for issues of drought and the low flow conditions opponents argue make the results of Thornburgh's expert analysis of aquatic habitat unreliable.

"Opponents, ODFW, and the Tribe have also raised issues that pending litigation regarding flow requirements and the [DB HCP] related to the Spotted Frog may lead to additional constraints on live flows. These issues are outside of the scope of the [resort's] impacts and [the resort] is not required to mitigate for them.

"Thornburgh must mitigate for its impacts, alone. Further, Thornburgh's plan relies primarily upon groundwater water sources, and its technical analysis shows that the 2022 FWMP will result in increased surface flows which are beneficial to fish and wildlife."

But LUBA concluded that the board's construction is also plausible, reasoning that the board's construction that "any negative impact" may be analyzed based on a baseline flow that represents a typical water year, measured only by the resort's impact on the system,

> "is not expressly inconsistent with the language of DCC 18.113.070(D) or the underlying policy—which is to hold a proposed resort accountable to completely mitigate the resort's impacts so that there is no net loss of fish resources."

LUBA thus deferred to and upheld the board's interpretation.

Bishop's assignments of error focus on the "no net loss" standard and relate primarily to the sufficiency of Thornburgh's evidence with respect to the "baseline" from which to determine a mitigation plan's impact on existing habitat and whether the 2022 FWMP satisfies the "no net loss" standard. In his first assignment, although Bishop characterizes LUBA's error as "shift[ing] the burden to Petitioners to properly define the baseline for study of whether the resort can meet the no net loss or degradation of fish and wildlife resources standard," underlying the assignment is Bishop's view that the evidence on which the board relied to establish a baseline was simply legally insufficient, because it failed to take into account basin-wide circumstances such as drought, groundwater decline, well deepening, and changed flows resulting from implementation of the DB HCP, affecting fish habitat beyond the resort's uses and impacts.

We are not persuaded that LUBA erred in determining that the board's narrow construction of DCC 18.113.070(D) is plausible and entitled to deference. As LUBA concluded, it is not contradicted by the text of the code provision. Nor are we persuaded that the county's construction is inconsistent with our holding in *Gould*, 233 Or App at 633, that "DCC 18.113.070(D) allows a focus on fish and wildlife habitat [as opposed to each individual species of fish] to establish that '[a]ny negative impact on fish and wildlife resources will be completely mitigated so that there is no net loss or net degradation of the resource.'"

LUBA further determined that the board's determination of a baseline flow using the 2016 hydrological year

was supported by substantial evidence. Bishop contends that LUBA erred, because the analysis of the board ignores pertinent changes in flows that have occurred since 2016 and that impact habitats, including drought, groundwater decline, well deepening, and changed flows resulting from implementation of the DB HCP. In reviewing LUBA's substantial evidence determination, our role is not to reweigh the record but to determine whether LUBA properly stated and applied the substantial evidence standard of review. *Citizens for Responsibility v. Lane County*, 218 Or App 339, 345, 180 P3d 35 (2008). LUBA did not err.

Also under his first assignment of error, Bishop contends that LUBA erred by shifting the burden of proof in assigning to petitioners responsibility to present the all the factors that must be considered in determining the proper baseline, rather than requiring the board to require Thornburgh to provide a complete assessment. We do not view LUBA's analysis to have shifted the burden; rather, LUBA determined that substantial evidence supported the board's findings.

The 2022 FWMP includes a provision relating to "compliance"—conditions that Thornburgh must adhere to in order to ensure that the 2022 FWMP meets the "no net loss" standard.[11] The board determined that "the 2022 FWMP ensures ongoing compliance with the No Net Loss

---

[11] Section D of the 2022 FWMP compliance provision describes the methods by which Thornburgh can establish compliance:

"Compliance: The purpose of this section is to clarify what constitutes compliance with this updated 2022 FWMP, whether during the review of Resort land use applications, as reported as part of annual monitoring, or for any other purpose. As noted above Thornburgh owns 1,211 AF of water rights to be used for pumping or mitigation and pumping at the point of diversion or appropriation of the certificate has been discontinued. For the reasons discussed herein compliance with this FWMP has been met for rights b-f, and will be met for the TSID water (g) in the manner discussed in this Section, 1b below. For any additional water rights that are acquired compliance will be met as described herein.

"1. Compliance with this FWMP will occur differently for water appropriated from a surface water Point of Diversion (POD) versus a groundwater Point of Appropriation (POA) or for a mitigation credit as follows:

"a. POA - Groundwater: For any future rights that may be acquired, compliance occurs upon the cessation of pumping of the rights and along with any of the following: deed evidencing the transfer of ownership, a submittal to OWRD of any of the following: (i) an assignment of the water right to

Standard and sufficient monitoring is required by the 2022 FWMP and FMP Condition 40."[12]

LUBA disagreed with the board with respect to the compliance provision's sufficiency and remanded the 2022 FWMP compliance provision to the board, concluding that the compliance provision's reliance on OWRD *applications* for groundwater permits was not sufficient. LUBA agreed with Bishop's contention that the county must require proof of completion of each alternative OWRD process, rather than mere ownership of a certificate and submittal of an application to OWRD, before the county may conclude that the "no net loss" standard has been satisfied. LUBA agreed with Bishop's contention that, under the 2022 FWMP, the county has no way to determine if fish habitat mitigation water will be available before approving actual buildings on site under a third-stage approval. LUBA also concluded that the 2022 FWMP reporting requirements are not sufficient to make up the shortcoming of the compliance provisions to demonstrate "no net loss." Thus, LUBA issued a narrow remand, relating to the sufficiency of the compliance conditions of the 2022 FWMP with respect to groundwater permits.[13]

In his second assignment of error, Bishop contends that the entire compliance section—not just that related to

---

Thornburgh, (ii) an application that seeks OWRD approval of a transfer to pump at the Resort property, or (iii) a cancellation in-lieu of mitigation.

"b. POD - Surface Water: Once acquired, Compliance occurs upon the cessation of pumping at the source and submittal to OWRD, and OWRD issues a final order (or its equivalent) approving any of the following: (i) an application that transfers to pump at the Resort property, (ii) an application that transfers the water to an in-stream lease, (iii) the cancellation in-lieu of mitigation, or (iv) an application to transfer to obtain mitigation credits, permanent or temporary.

"c. Mitigation Credit: ln the event that Thornburgh acquires mitigation credits, compliance occurs when Thornburgh provides proof of ownership or proof of submittal to OWRD to use the credits as mitigation.

"Thornburgh also agrees to the following measures to provide mitigation benefits over and above the benefits achieved by the mandatory measures described above."

[12] Condition 40 provides: "Thornburgh shall comply with the 2022 [FWMP], including its compliance and reporting mechanisms found in Section II of that plan."

[13] We note that Thornburgh's cross-petition, which we address later in this opinion, challenges LUBA's determination as to the sufficiency of the compliance provisions.

groundwater—was legally insufficient, because it allows Thornburgh to use all current listed water rights for consumption, leaving compliance with the "no net loss" standard to unidentified and not-yet purchased (or proven available) water rights. Bishop asserts that the board's finding that such prospective purchase of water rights would result in no net loss or degradation of fish and aquatic wildlife habitat has no support in the record, or basis in law or fact. Thus, Bishop contends, the 2022 FWMP "undeniably creates a loophole for compliance that does not assure no net loss/degradation of fish and aquatic wildlife habitat." Bishop also argues that an "instream water right" (ISWR) lease is insufficient as a form of compliance for surface water rights used for mitigation.

      Thornburgh responds that Bishop's arguments under his second assignment as relating to ISWR leases and surface water compliance provisions are not preserved—that Bishop did not make those arguments to LUBA and that LUBA's remand relates only to the inadequacy of compliance measures as to groundwater, and we agree. It is apparent from LUBA's order that Bishop did not present the lease argument to LUBA and that the remand is limited to compliance provisions relating to groundwater only.[14] We reject Bishop's second assignment of error as unpreserved.

———————

  [14] LUBA explained:

    "Thornburgh does not argue that the reporting requirements in the 2022 FWMP are sufficient to demonstrate no net loss, and we do not see that they are. The required report might show that the quantities and quality of water assumed in the 2022 FWMP have been provided, or it might not. No additional reporting is required during the review of any land use application related to the resort. As we understand it, the 2022 FWMP modeling assumes equal efficacy and reliability as between instream water right transfers and voluntary cancellation of water rights so that those legal processes have the same instream impacts on water quality and quantity. We agree with Bishop that the county's findings are inadequate to explain why submittal to OWRD is sufficient to satisfy the no net loss standard with respect to groundwater sources for fish habitat mitigation. Indeed, Thornburgh and the county rely upon OWRD processes to ensure that voluntary cancellation of water rights consistent with OWRD rules and review processes will result in improved fish habitat. *** The county has failed to explain how simple submittal of an application to OWRD permits the county to rely on those OWRD processes.

    "Thornburgh points to no evidence to support the county's conclusion that the '2022 FWMP ensures ongoing compliance with the No Net Loss Standard and sufficient monitoring is required by the 2022 FWMP and FMP Condition 40.' *** Thornburgh has not pointed to any evidence supporting a conclusion that ground water right certificate ownership, cessation of pumping, and

## VI.   THE TRIBE'S PETITION, CHALLENGING LUBA'S CONCLUSION THAT ERROR RELATING TO IMPLICATIONS OF TREATY RIGHTS IS UNPRESERVED

Under the provisions of the treaty with the Tribes of Middle Oregon, dated June 25, 1855 (1855 Treaty), the Tribe's predecessors ceded their traditional lands to the United States. In exchange, they reserved the lands that became the Warm Springs Reservation for their exclusive occupation and use, and a non-occupancy interest in ceded lands. Specifically with regard to fishery resources, the 1855 Treaty reserved to the Tribe the exclusive right to take fish "in the streams running through and bordering [the Warm Springs Reservation]" and at "all other usual and accustomed stations." 1855 Treaty; *Anthony v. Veatch,* 189 Or 462, 483, 220 P2d 493 (1950). The substantial majority of the Deschutes Basin, including Thornburgh Resort, lies within the lands used and occupied by the Tribe since time immemorial, and the Tribe is a sovereign co-manager of the fish resources of the Deschutes Basin.

The 1855 Treaty was enacted as federal law at 12 Stat 963 and is the "supreme law of the land." US Const, Art VI, § 2; *Skokomish Indian Tribe v. United States*, 410 F3d 506, 512 (9th Cir 2005), *cert den*, 546 US 1090 (2006) (citing *Breard v. Greene*, 523 US 371, 376, 118 S Ct 1352, 140 L Ed 2d 529 (1998). Thus, the State of Oregon, as well as its local governments, must observe the 1855 Treaty.[15] The interpretation of the 1855 Treaty is a matter of federal law. *State v. Begay*, 312 Or App 647, 652, 495 P3d 732 (2021); *see Felix Cohen, Cohen's Handbook of Federal Indian Law* § 2.01(1), 109 (Nell Jessup Newton ed 2012) (explaining that federal law governs the United States' recognition of tribal status and rights).

---

OWRD submittal is sufficient to ensure fish mitigation water will be provided as assumed in the 2022 FWMP."

[15] We reject Thornburgh's contention that the Ninth Circuit in *Skokomish Indian Tribe* held that local governments are not bound by tribal treaties. That court held only that a tribe is not a "private person" under section 1983 and therefore cannot maintain a private action for damages under section 1983 against a governmental entity that is not a party to the treaty for violation of fishing rights reserved by the treaty. 410 F3d at 514. The court did not address whether local governments are otherwise bound to comply with treaty provisions and the issue was not before the court.

The United States Court of Appeals for the Ninth Circuit has held that the 1855 Treaty secures to the Tribe and its members a right to a harvestable population of fish in the Deschutes Basin and to protect the habitat necessary to sustain those fish. *See generally United States v. Washington*, 853 F3d 946 (9th Cir 2017), *aff'd by an equally divided court*, 584 US 837 (2018). The court has held that the amount of instream water necessary to sustain that habitat is "at least equal to" what is needed to satisfy any applicable Endangered Species Act (ESA) obligations for listed-fish species, including the Middle Columbia River steelhead and bull trout. *Baley v. United States*, 942 F3d 1312, 1337 (9th Cir 2019).

The Tribe argued in its first assignment of error before LUBA that the board improperly failed to consider whether approval of the 2022 FWMP violates the fishing clause of the 1855 Treaty and improperly failed to consider the Treaty in determining whether the 2022 FWMP satisfies the "no let loss" standard under DCC 18.113.070(D) that the board was required to apply in considering Thornburgh's application. LUBA determined that the Tribe had failed to adequately raise that issue before the board and therefore had failed to preserve it for LUBA's consideration; thus, LUBA did not address the merits of the issue.

In its petition for judicial review, the Tribe contends that LUBA erred in determining that the Tribe failed adequately to preserve before the board and to present to LUBA whether the 1855 Treaty must be considered in determining whether the 2022 FWMP satisfied the "no net loss" standard. The Tribe points out that the right to fish on its reserved lands, as well as in all "usual and accustomed places," including those places now located on ceded lands, *see United States v. Winans*, 198 US 371, 381, 25 S Ct 662, 49 L Ed 1089 (1905) ("The right to resort to the fishing places in controversy was a part of larger rights possessed by the Indians, upon the exercise of which there was not a shadow of impediment, and which were not much less necessary to the existence of the Indians than the atmosphere they breathed."), includes the right to have fish to harvest in the usual and accustomed places of harvest. *United States v. Washington*, 853 F3d 946, 964 (9th Cir 2017), *aff'd by an equally divided court*, 584 US 837 (2018) ("The Indians

reasonably understood Governor Stevens to promise not only that they would have access to their usual and accustomed fishing places, but also that there would be fish sufficient to sustain them."). The Tribe asserts that its treaty-protected right to fish is a resource as to which there must be "no net loss" under DCC 18.113.070(D).[16]

The issue before us on judicial review is not the correctness of the Tribe's assertion relating to the extent to which the fishery resource guaranteed in the1855 Treaty must be considered by the board in evaluating Thornburgh's application, but whether the Tribe preserved the issue before the board for review by LUBA. As counsel for the Tribe stated at oral argument,

> "If we weren't stuck on the preservation issue, we might be before the Court deciding whether or not the Treaty imposes this positive obligation on the County or not. But that's not the issue before the Court today. The issue before the Court today is has the Tribe made the requisite showing to even have its day in court."

For the reasons below, we agree with the Tribe that it has made the requisite showing.

As the parties agree, "[a]n issue which may be the basis for an appeal to the Land Use Board of Appeals shall

---

[16] The Tribe asserted before LUBA that its treaty-protected fishery right is a resource that is at risk of potential loss or degradation as a result of Thornburgh's project, which relies primarily on groundwater withdrawals. Those withdrawals, the Tribe asserts, will drain aquifers underlying the project that have connectivity to surface water flows vital to the continued survival of at-risk fish species in the Deschutes Basin. The Tribe doubts that Thornburgh's proposal to mitigate those negative impacts by buying and/or canceling existing water rights elsewhere in the basin will sufficiently ensure that there will be enough water for fish to survive in nearby streams, and to ensure that the water flow and temperature will be sufficient to allow harvestable numbers of at-risk species of fish to survive at the Tribe's usual and accustomed fishing places during the proper time of year. The Tribe asserts that the latter is necessary to sustain the fishery resource in fulfillment of the Tribe's treaty-protected right to that resource. The Tribe argued before LUBA that despite multiple comments (including exhibits) and testimony by the Tribe's representative, Austin Smith Jr., providing indigenous knowledge about the fish and wildlife resources of the Deschutes Basin, the board decision concluded that the Tribe provided no "expert testimony" whatsoever, including with respect to its treaty-protected fisheries and their associated habitats. The Tribe asserted before LUBA that the board erred when it failed to consider the Tribe's treaty-protected right to the fishery resource in determining that there would be no net loss or degradation as a result of Thornburgh's proposed project.

be raised not later than the close of the record \*\*\* before the local government[.]" ORS 197.797(1). The Tribe preserved its arguments relating to the impact of the 1855 Treaty on the "no net loss" determination before the board. The record, including the Tribe's three comment letters addressed to the board and the Tribe's representative's testimony at the February 1, 2023, public hearing, reflects that the Tribe brought to the board's attention the importance of considering the Tribe's fishery resource as an aspect of the "no net loss" standard. In a letter of January 31, 2023, the Tribe's representative, Austin Smith Jr., General Manager of the Tribe's Branch of Natural Resources, raised concerns about the potential impact of the proposed 2022 FWMP on ESA-listed fish species and about Thornburgh's lack of consultation with the Tribe, despite the Tribe's status as a sovereign co-manager of the fisheries resources throughout the Deschutes Basin. Smith also observed that technical expertise was required to properly evaluate the complex issues implicated by the proposed 2022 FWMP and that, while the Tribe possessed technical expertise, it needed time assess the issues and to consult its co-managers, ODFW and the OWRD. In his letters to the board, Smith specifically raised the issue of the Tribe's treaty-protected rights as implicating resources under the "no net loss" standard.[17] We note, further, Smith's March 1, 2023, letter to the board:

> "[T]he Tribe does not currently have enough information to evaluate whether [Thornburgh] can \*\*\* demonstrate that its water use and mitigation plan completely mitigates negative impacts on the fishery resource so that there is no net loss or net degradation of the resource. \*\*\* Because the fishery resources at issue are both treaty-protected and vital to the Tribe's cultural identity and existence, the Tribe urges the Commission to resolve these questions in favor of a more deliberate process."

---

[17] On January 3, 2022, Smith requested an extension of the record to allow additional time for the Tribe, which had not previously received notification of the application, to develop a response and provide additional information. With Thornburgh's agreement, the BOCC allowed an extension of the record for 30 days. The Tribe submitted materials to the BOCC, including a letter from Smith on January 31, 2022, explaining the connection between the Tribe's treaty-protected fishery resource and the "no net loss" standard. The hearing before the BOCC occurred on the following day, February 1, 2023.

The standard for preservation of an issue for review before LUBA "requires no more than fair notice to adjudicators and opponents, rather than the particularity that inheres in judicial preservation concepts." *Boldt v. Clackamas County*, 107 Or App 619, 623, 813 P2d 1078 (1991). Contrary to LUBA's conclusion, the letters of January 31, 2023, and March 1, 2023, were legally sufficient to assert before the board that the county must apply the "no net loss" standard so as to encompass recognition of the 1855 Treaty and the Tribe's fishery resource, as historically recognized by the Tribe, to "include the right to have fish to harvest in the usual and accustomed places of harvest." *Washington*, 853 F3d at 964. We conclude that the board had fair notice of the Tribe's assertion that an evaluation of the "no net loss" standard implicated consideration of the Tribe's treaty-protected fishery resource and, therefore, that the Tribe sufficiently preserved the issue before the board.

We further conclude that the Tribe sufficiently raised the issue before LUBA. In its opening brief before LUBA, the Tribe summarized its argument concerning the Treaty: "[T]he County improperly construed the 1855 Treaty by failing to consider whether its approval of the 2022 FWMP violates the fishing clause in the 1855 Treaty, which includes a right to fish habitat protection." LUBA viewed that argument as different from and insufficient to raise the more precise argument that the Tribe stated in its reply brief and at oral argument before LUBA, and which it now raises on judicial review, that "proper application of DCC 18.113.070(D) required the County to consider whether the 2022 FWMP violates the fishing clause of the 1855 Treaty." The Tribe's argument in its opening brief before LUBA was not so narrow. Implicit in the Tribe's argument that the board had approved the 2022 FWMP in violation of the fishing clause of the 1855 Treaty was the contention that the "no net loss" requirement of DCC 18.113.070(D) must be construed to include consideration of the Tribe's treaty fishing rights. The Tribe made the latter point explicitly in its argument under the second assignment:

> "The [board] cannot conclude, as a matter of law, that 'system wide benefits' (whatever that phrase may mean) satisfy the no net loss standard in DCC 18.113.070(D) without

expressly finding that the 2022 FWMP does not violate either the 1855 Treaty or [other state law].”

Thus, we conclude that the Tribe adequately articulated in its opening brief before LUBA that the treaty-protected fishery resource is a resource to which there can be “no net loss” or degradation under DCC 18.113.070(D), and that any net loss to the Tribal fishery resource is a violation of DCC 18.113.070(D) and the 1855 Treaty. Further, in its reply brief before LUBA, the Tribe clarified that position when it argued:

> “The [board] and parties had fair notice that Tribe asserted that the fish resources affected by the 2022 FWMP are protected by the 1855 Treaty. The Tribe also demonstrated that it understood that DCC 18.113.070(D) contains the applicable approval criterion, which requires no net loss or degradation of fish resources, including those protected by the 1855 Treaty. The Tribe asserted treaty rights in the fish resources of the Deschutes Basin, including an enforceable right to take fish through the basin and the right to fish habitat protection so that it would have fish to take.”

We conclude that the Tribe adequately preserved before the board and presented to LUBA its arguments concerning the relationship between the Tribe’s treaty rights and the “no net loss” standard. LUBA erred in concluding otherwise.

In its second assignment of error, the Tribe contends that LUBA’s order misapplied the substantial evidence standard of review and is unlawful in substance in failing to consider evidence supplied by the Tribe based on its indigenous knowledge. We have held that LUBA properly deferred to the board’s narrow construction of DCC 18.113.070(D) that negative impacts are to be measured only by the *resort’s* impact on the system, not the cumulative impacts of drought or other basin-wide water policy and management issues. As for indigenous knowledge related specifically to impacts of the resort, in its briefing, the Tribe argued that “indigenous knowledge,” to which the Tribe asserts the county paid short shrift, consisted of the entirety of the comments and materials submitted by the Tribe, including exhibits, and testimony from Smith, regarding the fish resources of the Deschutes Basin. At oral argument before us, the Tribe argued that if the Tribe had

had sufficient time for preparation for the hearing before the board, it could also have presented as indigenous knowledge evidence concerning the impact of the resort's pumping on very specific seasonal fishing grounds.

On this assignment, we are guided by our standard of review, under which we consider only whether LUBA correctly applied the substantial evidence standard in its determination that the county's decision demonstrates that the county considered the Tribe's evidence concerning indigenous knowledge and weighed the Tribe's evidence against Thornburgh's evidence. Given the limited record before the county, we conclude that LUBA did not err.

But, assuming that LUBA remands the case to the board for consideration of the Tribe's arguments relating to the treaty-protected fishery resource on the first assignment of error, we highlight that remand will allow an opportunity for the Tribe to present evidence of indigenous expertise and knowledge for the board's consideration that the Tribe asserts it did not have adequate time to present due to its late involvement in the proceedings.

## VII.  THORNBURGH'S CROSS-PETITION RELATING TO LUBA'S REMAND OF GROUNDWATER COMPLIANCE PROVISIONS

In its cross-petition, Thornburgh challenges LUBA's order determining that groundwater compliance measures and reporting requirements set forth in the 2022 FWMP are insufficient. Thornburgh contends that LUBA's order is unlawful "in procedure," because the board and weighed the evidence in the record as the factfinder in the first instance, rather than reviewing for substantial evidence.

As to groundwater compliance, Section D of the 2022 FWMP provides:

"For any future rights that may be acquired, *compliance occurs upon the cessation of pumping of the rights and along with any of the following*: deed evidencing the transfer of ownership, a submittal to OWRD of any of the following: (i) an assignment of the water right to Thornburgh, (ii) an application that seeks OWRD approval of a transfer to

pump at the Resort property, or (iii) a cancellation in-lieu of mitigation."

(Emphasis added.) LUBA agreed with Bishop's contention that the compliance provision was inadequate to meet the "no net loss" standard to the extent that it permitted only a "submittal" to OWRD of an application for an assignment of a water right to Thornburgh, rather than an actual approval of an assignment of the water right.

LUBA said in its order, "We agree with Bishop that the county's findings are inadequate to explain why submittal to OWRD is sufficient to satisfy the no net loss standard with respect to groundwater sources for fish habitat mitigation." LUBA further concluded, "Thornburgh has not pointed to any evidence supporting a conclusion that ground water right certificate ownership, cessation of pumping, and OWRD submittal is sufficient to ensure fish mitigation water will be provided as assumed in the 2022 FWMP."

Thornburgh contends in its cross-petition that LUBA misunderstood the compliance provision. Thornburgh asserts that there is much evidence in the record that it is the cessation of pumping of any newly acquired groundwater interest that results in mitigation, by allowing the water to remain in the aquifer in support of fish habitat, and that the additional documentation required by an application to the OWRD merely reinforces the cessation of use of the water. We have reviewed the record and conclude that LUBA correctly applied the substantial evidence standard in its evaluation of the compliance and reporting requirements. We therefore reject Thornburgh's contention on its cross-petition.

Reversed and remanded to LUBA on petition of The Confederated Tribes of the Warm Springs Reservation of Oregon, for consideration of Tribe's first assignment of error to LUBA; affirmed on cross-petition; otherwise affirmed.